Filed 12/8/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re T.G. et al., Persons Coming Under the Juvenile Court Law. | B303987 <br><br> (Los Angeles County Super. Ct. Nos. 17CCJP02322B-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> TAMARA S., <br><br>     Defendant and Appellant. | |
| In re JAZMINE H., a Person Coming Under the Juvenile Court Law. | B304055 <br><br> (Los Angeles County Super. Ct. No. 17CCJP02322A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> JASON H., <br><br>     Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Emma Castro, Juvenile Court Referee. The section 366.26 orders are conditionally reversed. The matters are remanded with directions.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant Tamara S.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant Jason H.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————

Tamara S. is the mother of four children, 16-year-old Jazmine H., 14-year-old T.G., 12-year-old N.G. and eight-year-old P.G. Jason H. is the biological father of Jazmine. Shaka G. is the presumed father of T.G., N.G. and P.G. All four children were declared dependents of the juvenile court, removed from parental custody and placed with the same nonrelated extended family members who were subsequently appointed their legal guardians. In separate appeals Jason H. challenges the juvenile court's order pursuant to Welfare and Institutions Code section 366.26[1] granting a guardianship, appointing legal guardians and terminating its jurisdiction as to Jazmine (B304055), and Tamara challenges the section 366.26 orders granting guardianships, appointing legal guardians and terminating jurisdiction as to T.G., N.G. and P.G. (B303987).

The sole issue in both appeals is whether the juvenile court and the Los Angeles County Department of Children and Family

---

[1] Statutory references are to this code unless otherwise stated.

2

Services (Department) complied with their duties of inquiry and notice under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.  We agree the Department failed to adequately investigate Tamara's claim of Indian ancestry and the juvenile court failed to ensure an appropriate inquiry had been conducted before concluding, if it ever actually did, ICWA did not apply to these proceedings.  In reaching this result, we disagree with the holding in *In re Austin J.* (2020) 47 Cal.App.5th 870, 888-889 (*Austin J.*) that amendments enacted by Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (Assembly Bill 3176) were intended to limit the Department's robust duty of inquiry.  Accordingly, we conditionally reverse the orders for legal guardianship and remand the matters to allow the Department and the juvenile court to rectify their errors and to take all other necessary corrective actions.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Dependency Proceedings*

The children were initially removed from parental custody on December 1, 2017.  Jazmine and P.G. were placed with nonrelated extended family members Bridget L. and her husband, Eric L.[2]  T.G. and N.G. were initially placed with their maternal grandmother, Loretta S., but in July 2018 joined Jazmine and P.G. at Bridget and Eric's home.

On December 7, 2017 the Department filed a petition on behalf of the children pursuant to section 300, subdivisions (a) and (b)(1), alleging Tamara and Shaka had a history of domestic

---

[2]    Bridget is the godmother for some of the children.  She and Eric have known Tamara and her family for years and had been neighbors in the past.

violence in the presence of the children; Tamara had a history of mental and emotional problems; and Tamara allowed the children to reside with Jazmine's paternal grandmother, who Tamara knew was an abuser of marijuana. At the initial detention hearing on December 8, 2017 the court found a prima facie case for detaining the children.

In February 2018 the juvenile court ordered a paternity test be conducted for Jason and Jazmine. In March 2018 the court found Jason was Jazmine's biological father based on the DNA test results.

On March 28, 2018 the Department filed a first amended petition adding allegations concerning Tamara's history of abuse of prescription drugs and Jason's criminal history. In addition, the first amended petition alleged Tamara had neglected Jazmine's medical needs.

The court sustained in part the first amended petition, as further amended by interlineation, at a jurisdiction hearing on April 20, 2018.[3] The children were declared dependents of the juvenile court and suitably placed under the supervision of the Department. The court ordered family reunification services for Tamara and Shaka. No services were ordered for Jason, who was

---

[3] The court sustained under section 300, subdivisions (a) and (b)(1), counts alleging Tamara and Shaka had a history of domestic violence and engaged in violent altercations in front of the children; under subdivision (b)(1) counts alleging Tamara had a history of mental and emotional problems and failed to regularly participate in mental health services, and Tamara failed to obtain necessary medical care for Jazmine; and under subdivision (j) a count alleging Tamara's medical neglect of Jazmine endangered the other children. The remaining counts were dismissed. Jason was nonoffending.

4

a biological father only and was incarcerated with an estimated release date at least one year away.[4]

At the six-month review hearing (§ 366.21, subd. (e)) in October 2018, the court found Tamara and Shaka had participated only minimally in their case plans. Further reunification services were ordered. At the 12-month review hearing (§ 366.21, subd. (f)) in February 2019, the court found Tamara's and Shaka's participation in services had been "nonexistent." The court terminated reunification services and set the matter for a selection and implementation hearing pursuant to section 366.26.

The Department initially recommended adoption as the permanent plan for the children. However, Bridget and Eric L. stated their preference for legal guardianships, and the Department modified its recommendation accordingly.

At a continued section 366.26 hearing on January 7, 2020, applying section 366.26, subdivision (c)(1)(A)'s exception to the legislative preference for adoption as the permanent plan, the court found by clear and convincing evidence that the children were adoptable but were living with relatives who were unable or unwilling to adopt the children and were able to provide stability and permanency through legal guardianship. The court further found it would be detrimental to remove the children from their relatives' home and would be detrimental to return them to their parents.[5] Legal guardianship was ordered as the children's

---

[4] Jason was apparently released from prison in April 2019.

[5] In addition to the court's findings pursuant to section 366.26, subdivision (c)(1)(A), the minute orders for the January 7, 2020 hearing state the court found by clear and convincing evidence that the children were not likely to be

5

permanent plan, and Bridget and Eric L. were appointed the legal guardians of each child.  Jurisdiction was terminated as to Jazmine.  The matter was continued as to T.G., N.G. and P.G. to January 24, 2020 to resolve an issue of visitation.  Jurisdiction was terminated as to those three children on that date.

2.  *ICWA Information and Inquiry*

a.  *The initial ICWA forms and the detention hearing*

Judicial Council form ICWA-010(A), prepared by the Department and attached to the original dependency petition filed on December 7, 2017, stated the children may have Indian ancestry.  The form indicated Tamara had been questioned in person on November 22, 2017 and reported her father (that is, the children's maternal grandfather) had Indian ancestry, "but no connection to a tribe.  No additional information was given."  The detention report filed December 7, 2017 contained the same information.

On Tamara's ICWA-020 form with Jazmine's name and case designation, 17CCJP02322A, filed at the time of the detention hearing on December 8, 2017, the preparer checked the box for "I may have Indian ancestry," inserted Cherokee as the name of the band or tribe on Tamara's maternal side, and additionally indicated possible Indian ancestry on Tamara's paternal side through her great-grandfather, Theodore S.  The date "7-4-30" was written below the paternal great-grandfather's name.  On the ICWA-020 forms filed at the same time for the other three children, with case designations 17CCJP02322B-D, the preparer simply checked the box for "I may have Indian

---

adopted.  The reporter's transcript of the January 7, 2020 hearing does not include any such finding.

ancestry," omitting the additional details provided to the court on Jazmine's form.[6]

At the December 8, 2017 detention hearing for all four children, the court stated Tamara's ICWA-020 indicated she may have American Indian ancestry. The court asked Loretta S., who had been identified on the record as the maternal grandmother, if she had American Indian ancestry on her side of the family. Loretta S. answered, "Yes." The court inquired, "And what tribe?" Loretta S. answered, "Cherokee." The following colloquy then occurred:

"The Maternal Grandmother: Well, that's what—from my understanding from what my mother told me.
"The Court: From family history, you've been told that you have Cherokee Nation Heritage?
"The Maternal Grandmother: Yes.
"The Court: Ms. S[.], Mother, is that where you're claiming heritage is through your mother?
"The Mother: On my father's side.
"The Court: Your mother and your father's side. All right. So do you know—would it be fair to say you don't know the ancestor through which you claim Cherokee heritage?
"The Maternal Grandmother:  No, I don't.
"The Court: And on your father's side Ms. S[.], Mother, who do you claim heritage through?
"The Mother: I don't know
"The Court: So, what do you know about American Indian heritage through your father's side, if you can tell me?

---

[6]    It appears counsel, not Tamara, may have prepared the ICWA-020 forms.

7

"The Mother:  Through my grandfather.  He's deceased now.  He told us about my background.

"The Court:  So that's your father's father?

"The Mother:  Yes.

"The Court:  And what was his name?

"The Mother:  Theodore S[.].  [¶] . . . [¶]

"The Court:  Okay.  And is there anyone still living that knows the birth date for Theodore S[.]?

"The Mother:  My aunt.

"The Court:  So you'd be able to contact your aunt and find out more information about what relative claimed heritage and/or your grandfather's birth date?

"The Mother:  Yes.

"The Court:  And if you'll be kind enough to do that and report to the social worker by the end of next week.

"The Mother:  Yes.  [¶] . . . [¶]

"The Maternal Grandmother:  I know the birth day.

"The Court:  Okay.  For Theodore S[.]?

"The Maternal Grandmother:  Yes.  7-4-30.

"The Court:  Did they advise you what tribe was the Native American heritage?

"The Mother:  No."

The court then made the following order, the meaning and significance of which is disputed by the parties:  "So, Cherokee on the maternal grandmother's side.  And unknown— The Department is to send notice to the Department of the Interior, the Bureau of Indian Affairs, and the Cherokee Nation.  As to the Cherokee Nation, first, the Department—strike that.  As to a specific tribe, on Mother's statement that her paternal grandfather had American Indian heritage, once the mother

8

contacts her aunt, if there is a specific tribe that is identified, the Department is to provide notice to that tribe as well. Right now all we know from the maternal grandmother, Loretta S[.], who's present in court, is that she believes it was the Cherokee Nation tribe on her side of the family. Correct?" Loretta S. responded, "Correct."

The reporter's transcript from the detention hearing does not include any other ICWA discussion or ICWA finding by the court. Despite that, and notwithstanding the exchange among the court, Tamara and Loretta S. just quoted, the minute order for the December 8, 2017 detention hearing recited, "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep the Department, their Attorney and the Court aware of any new information relating to possible ICWA status." The minute order additionally stated, "The determination of ICWA status is deferred for father's appearance."

### b. *Further ICWA inquiry, the jurisdiction/disposition report and the jurisdiction hearing*

According to the Department's February 6, 2018 jurisdiction/disposition report, Tamara had advised the Department on January 18, 2018 that the paternal side of her family had "Khalifian Native American Ancestry."[7] She was unable to provide additional information, Tamara explained, because her paternal relatives did not talk about their background.

---

[7] The Khalifian (or Califian) is not a federally recognized tribe.

The jurisdiction/disposition report and subsequent court filings by the Department reflect ongoing contact between the Department and Loretta S., as well as with other maternal relatives, but no indication of any efforts to develop additional information concerning Indian ancestry through that side of Tamara's family. The February 6, 2018 report stated ICWA "does or may apply."

The jurisdiction hearing was continued from February 6, 2018 to April 12, 2018. At the February 6, 2018 hearing, however, in addition to formal detention findings as to Shaka and discussion of T.G., N.G. and P.G.'s possible American Indian ancestry through him, the Department's counsel observed, "I also saw that the court ordered notice to Cherokee. Mother had alleged, I guess, Native American." The court[8] inquired, "Do we have that notice?" Counsel responded, "I don't see it." The court then ordered, "For the R.O.R. [a March 29, 2018 nonappearance receipt-of-report date], Notice to the Cherokee Nation. Also, if it was to the Cherokee Nation, it's the Bureau of Indian Affairs and the Department of the Interior. I see that on the detention report."

The minute order for the February 6, 2018 hearing indicates the Department was ordered to investigate Shaka's claim of possible American Indian ancestry and to include details regarding that investigation in its next report to the court. It also states, "DCFS is to send notice to appropriate tribe(s), the bureau of Indian affairs and the secretary of the interior," but does not include the court's express direction to provide notice to

---

[8]     Juvenile Court Referee Emma Castro was the bench officer at both the detention hearing and the February 6, 2018 hearing.

the Cherokee Nation.  There is no dispute that no ICWA notice of any sort was ever sent in these proceedings.

### c. *Subsequent reports concerning ICWA status*

As had the February 2018 jurisdiction/disposition report, an interim review report dated April 12, 2018 and prepared for the continued jurisdiction hearing stated ICWA does or may apply.[9]  However, the interim review report filed the following month on May 11, 2018 simply stated ICWA does not apply; no explanation was provided.  A status review report dated February 7, 2019, prepared for the 12-month review hearing, again stated ICWA does not apply and asserted the court had found ICWA did not apply at the detention hearing on December 8, 2017.  That same statement was thereafter repeated in all subsequent reports, including the report for the section 366.26 selection and implementation hearings at issue in

---

[9]     The April 12, 2018 report also stated Shaka had disclaimed any Indian ancestry during a February 21, 2018 telephone interview with one of the Department's dependency investigators.  Presumably, therefore, the continuing comment that ICWA may apply was based on Tamara's statements.

At the jurisdiction hearing on April 12, 2018 the court admitted exhibits presented by the parties, heard argument and then continued the hearing to April 20, 2018.  The reporter's transcript contains no mention of ICWA.  The minute orders from that date state, "No Indian Ancestry is declared on [Shaka's] ICWA-020 form."  The minute order contains no other reference to ICWA, and the minute orders from the continued jurisdiction hearing on April 20, 2018 do not mention ICWA.  In subsequent reports the Department noted the reference in the April 12, 2018 minute order to Shaka's ICWA-020 form.

these appeals. None of the court's subsequent orders includes ICWA findings.

## DISCUSSION

### 1. *ICWA and the Duties of Inquiry and Notice*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*); *In re W.B.* (2012) 55 Cal.4th 30, 47.)[10] As the Supreme Court explained in *Isaiah W.*, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*Isaiah W.*, at p. 7.)[11]

---

[10] For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (See 25 U.S.C. § 1903(4) [definition of "'Indian child"] & (8) [definition of "'Indian tribe"]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

[11] In its executive summary to the federal regulations adopted in 2016 to promote ICWA compliance, the Bureau of Indian Affairs provided a further description of the tragic conditions that led to enactment of ICWA: "The empirical and anecdotal evidence showed that Indian children were separated from their

12

ICWA significantly limits state court actions concerning out-of-family placements for Indian children.  "When ICWA applies, a state court may not, for example, make a foster care placement of an Indian child or terminate parental rights to an Indian child unless the court is satisfied 'that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.'  [Citations.]  Prior to placing an Indian child in foster care, the court must also make 'a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.'"  (*Austin J., supra*, 47 Cal.App.5th at p. 882.)  ICWA and the controlling federal regulations (see 25 C.F.R. pt. 23 (2020)) simply set a floor for minimal procedural protections for Indian children, their families and their tribes; the statute authorizes states to provide "a higher

---

families at significantly higher rates than non-Indian children. In some States, between 25 and 35 percent of Indian children were living in foster care, adoptive care, or institutions. [Citation.]  Indian children removed from their homes were most often placed in non-Indian foster care and adoptive homes. [Citation.]  These separations contributed to a number of problems, including the erosion of a generation of Indians from Tribal communities, loss of Indian traditions and culture, and long-term emotional effects on Indian children caused by loss of their Indian identity.  [Citation.]  [¶]  Congress found that removal of children and unnecessary termination of parental rights were utilized to separate Indian children from their Indian communities."  (81 Fed.Reg. 38780 (June 14, 2016).)

standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA. (25 U.S.C. § 1921; see *In re Abbigail A.* (2016) 1 Cal.5th 83, 93; *Austin J.*, at p. 883.)

 a. *Notice when there is "reason to know"*

Notice to Indian tribes is central to effectuating ICWA's purpose, enabling a tribe to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter. (*Isaiah W., supra*, 1 Cal.5th at p. 8.) Notice to the parent or Indian custodian and the Indian child's tribe is required by ICWA in state court proceedings seeking foster care placement or termination of parental rights "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a).) Similarly, California law requires notice to the parent, legal guardian or Indian custodian and the Indian child's tribe if the child protective agency or court "knows or has reason to know . . . that an Indian child is involved" in the proceedings. (Welf & Inst. Code, § 224.3, subds. (a), (b); see *Austin J., supra*, 47 Cal.App.5th at pp. 884-885; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1050; see also Cal. Rules of Court, rule 5.481(c)(1) [notice is required "[i]f it is known or there is reason to know that an Indian child is involved in a proceeding listed in rule 5.480," which includes all dependency cases filed under Welfare and Institutions Code section 300].)[12]

With respect to the notice requirement, in language substantially the same as that of the controlling federal regulation (25 C.F.R. § 23.107(c) (2020)), Welfare and Institutions

---

[12] References to rules are to the California Rules of Court.

Code section 224.2, subdivision (d), provides, "There is reason to know a child involved in a proceeding is an Indian child under any of the following circumstances: [¶] (1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."[13]  (See also rule 5.481(b)(1).)

---

[13]     As explained in *Austin J.*, *supra*, 47 Cal.App.5th at pages 884-885, "In 2018, the Legislature enacted changes to the state's ICWA-related statutes for the purpose of conforming state law to recent changes in federal ICWA regulations.  [Citations.] The changes included a redefinition of the 'reason to know' requirement that triggers the duty to give notice of the proceedings to Indian tribes. . . . .  [¶]  This definition . . . replaced a definition under which the court would have a 'reason to know' that a 'child is an Indian child' based merely upon 'information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.'"

b. *The initial inquiry and the duty of further inquiry*

Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's or other relative's identification of the family's tribal affiliation is not accurate. Accordingly, just as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it. (See *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 787.) Yet neither ICWA itself nor the implementing federal regulations in effect prior to 2016 imposed a duty on courts or child protective agencies to inquire whether a child involved in a dependency proceeding was an Indian child. (See *In re A.B.* (2008) 164 Cal.App.4th 832, 838; *In re H.B.* (2008) 161 Cal.App.4th 115, 120.)

Notwithstanding this gap in federal law, long-standing, albeit nonbinding, federal guidelines urged states to "make inquiries to determine if the child involved is a member of an

_____

The parties agree the law in effect in January 2020 when the section 366.26 hearings were held applies to these appeals. (See *In re A.M.* (2020) 47 Cal.App.5th 303, 321 ["[s]ince Mother is appealing from the findings made at the September 6, 2019 section 366.26 hearing and not those in 2017 or 2018, the current ICWA statutes apply"]; see also *Isaiah W.*, *supra*, 1 Cal.5th at p. 10 ["Properly understood, Ashlee's present appeal does not seek to challenge the juvenile court's finding of ICWA's inapplicability underlying the January 2012 dispositional order. It instead seeks to challenge the juvenile court's finding of ICWA's inapplicability underlying the April 2013 order terminating her parental rights"].)

Indian tribe or if a parent of the child is a member of an Indian tribe and the child is eligible for membership in an Indian tribe." (Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67588, § B.5(a) (Nov. 26, 1979); see *In re H.B.*, *supra*, 161 Cal.App.4th at p. 121.) Exercising its authority to provide a higher standard of protection to Indian families, the Legislature incorporated many of the Guideline's best-practice recommendations into California law in 2006 with the passage of Senate Bill No. 678 (2005-2006 Reg. Sess.) (Stats. 2006, ch. 838, § 1, p. 6536), including enactment of former section 224.3, subdivision (a), which provided that courts and county welfare departments "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceedings if the child is at risk of entering foster care or is in foster care." (See *Isaiah W.*, *supra*, 1 Cal.5th at p. 9.)

Now found in section 224.2, subdivision (a), following enactment of Assembly Bill 3176, the court and child protective agencies remain under "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child." That duty to inquire begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child. (§ 224.2, subds. (a)-(c); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

In addition to the court's and agency's responsibilities at the outset of the proceedings, section 224.2, subdivision (e), in effect in January 2020 when the section 366.26 hearings took place in these proceedings, imposed a duty of further inquiry

17

regarding the possible Indian status of the child "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding."[14]  That duty of further inquiry requires interviewing, "as soon as practicable," extended family members, contacting the Bureau of Indian Affairs and "[c]ontacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e)(1)-(3).)  This informal contact with the tribe must include "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(3); see *In re D.F.*, *supra*, 55 Cal.App.5th at p. 567.)

In addition, rule 5.481(a)(4) mandates further inquiry if a social worker or investigator "knows or has reason to know or believe that an Indian child is or may be involved."  Significantly,

---

[14]     As several recent court of appeal decisions have observed, in requiring further inquiry when there is a reason to believe an Indian child is involved in the proceedings, the Legislature in Assembly Bill 3176 did not define the phrase "reason to believe." (See, e.g., *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566; *Austin J.*, *supra*, 47 Cal.App.5th at p. 883.)  To remedy that omission the Legislature in urgency legislation effective September 18, 2020 amended section 224.2, subdivision (e), to provide, "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."  (Assem. Bill No. 2944 (2019-2020 Reg. Sess.); Stats. 2020, ch. 104, § 15.)  Notwithstanding this amendment, we refer in our opinion to section 224.2, subdivision (e), as it read in January 2020 when the section 366.26 hearings took place.

18

this rule, which is entitled to judicial deference (see *In re Abbigail A., supra*, 1 Cal.5th at p. 92), was amended by the Judicial Council, effective January 1, 2020, in conformity with Assembly Bill 3176 to add "or believe" to the triggering requirement that an Indian child "is or may be involved."  (See Judicial Council of Cal., Tribal Ct.– State Ct. Forum, and Family and Juvenile Law Advisory Com. Rep., Indian Child Welfare Act (ICWA): Implementation of AB 3176 for Indian Children, Sept. 5, 2019, p. 11.)[15]

---

[15]     The California Constitution directs the Judicial Council to "adopt rules for court administration, practice and procedure." (Cal. Const., art. VI, § 6, subd. (d); see Welf. & Inst. Code, § 265 [concerning rules for juvenile courts].)  Rules adopted by the Judicial Council "are entitled to a measure of judicial deference." (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1014; accord, *In re Abbigail A., supra*, 1 Cal.5th at p. 92.)  The Judicial Council, however, may not adopt rules that are inconsistent with the governing statutes.  (See *In re W.B., supra*, 55 Cal.4th at p. 58, fn. 17; *In re Richard S.* (1991) 54 Cal.3d 857, 863.)  "'In this context, a rule is inconsistent with a statute if it conflicts with either the statute's express language or its underlying legislative intent.'" (*Abbigail A.*, at p. 92.)  Here, the amendment's inclusion of the phrase "reason to know or believe" simply parallels Assembly Bill 3176's use of "reason to believe" in section 224.2, subdivision (e), and is fully consistent with the statute's express language, as well as with legislative intent as reflected not only in Assembly Bill 3176 but also in the recent amendment to section 224.2, subdivision (e), discussed in the preceding footnote.

19

## 2. *Jason Has Standing To Appeal as a "Parent" Under ICWA*

Describing Jason as "a mere biological father" and citing *In re Joseph G.* (2000) 83 Cal.App.4th 712, 716, which held an alleged biological father who is not a party of record in the juvenile court has no standing to appeal an order terminating parental rights, the Department urges us to dismiss Jason's appeal for lack of standing.  It argues, because Jason never appeared and asserted a position in Jazmine's dependency case, he was not a party of record and is not "aggrieved" by the order for legal guardianship, a requirement for standing to appeal. (See Code Civ. Proc., § 902 ["[a]ny party aggrieved may appeal in the cases prescribed in this title"]; Welf. & Inst. Code, § 395, subd. (a)(1) ["[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment"].)

Whatever merit the Department's standing argument regarding a "mere biological parent" may have in other contexts, it fails here.  Non-Indian parents have standing to raise issues of ICWA compliance on appeal.  (*In re A.W.* (2019) 38 Cal.App.5th 655, 663; *In re B.R.* (2009) 176 Cal.App.4th 773, 779-780.)  ICWA defines a "'parent'" to include "any biological parent," while excluding "the unwed father where paternity has not been acknowledged or established."  (25 U.S.C. § 1903(9).)  As discussed, Jason's status as Jazmine's biological father was established by DNA testing and confirmed by the juvenile court.  Accordingly, Jason is entitled to appeal the order for legal guardianship, challenging the Department's and the court's compliance with ICWA inquiry and notice requirements.

### 3. *The Department Did Not Adequately Investigate Tamara's Claim of Indian Ancestry*

Tamara filed an ICWA-020 form at the time of the detention hearing declaring her belief she had Cherokee ancestry on her maternal side and indicating possible Indian ancestry through her paternal grandfather, Theodore S., without identifying a tribe. That information was confirmed during the detention hearing by both Tamara and Loretta S. Tamara stated an aunt might have information about the family's ancestry on the paternal side, and the court asked her to contact the aunt and report any additional details she learned. Loretta S., replying to the court, said she did not know the ancestor through whom the family's Cherokee ancestry could be traced. The court did not ask either Tamara or Loretta S. if other relatives might have additional information about the family's Cherokee ancestry or whether anyone other than Tamara's aunt might have information about Indian ancestry on her paternal side.

These preliminary responses from the mother and maternal grandmother of Jazmine, T.G., N.G. and P.G. unquestionably provided reason to believe Indian children might be involved in these dependency proceedings and triggered the Department's duty to make further inquiry, as mandated by section 224.2, subdivision (e), and rule 5.481(a)(4). (See *In re A.M.* (2020) 47 Cal.App.5th 303, 322 [mother's statement she had been told she may have Indian ancestry with Blackfeet and Cherokee tribes and identification of her grandfather as having possible Indian ancestry, while not requiring ICWA notice, were sufficient to require further inquiry under section 224.2, subdivision (e), as amended by Assembly Bill 3176]; see also *In re Elizabeth M.*, *supra*, 19 Cal.App.5th at pp. 786-787.) The

Department's breach of that duty and the juvenile court's failure to ensure compliance require a conditional reversal of the orders made at the section 366.26 hearings and a remand for an adequate investigation of the children's Indian ancestry.

The Department's arguments that no duty of further inquiry existed in this case fail. First, it notes Tamara's ICWA-020 forms for T.G., N.G. and P.G., although reflecting a checked box for the statement she may have American Indian ancestry, did not include any additional detail regarding the children's possible tribal membership. By that omission, the Department contends, Tamara "affirmatively communicated to the juvenile court that neither she nor the children were members of any Indian tribe." This argument, which can only be described as disingenuous, ignores that Tamara's ICWA-020 form for Jazmine, submitted to the court at the same time as the other three forms and before the court at the detention hearing, contained the information she knew regarding her maternal and paternal relatives. It also fails to acknowledge that Tamara again provided this information to the court at the hearing.[16] Tamara affirmatively, and repeatedly, provided the information the Department now claims was missing.

Moreover, even if the additional information had not been provided in the ICWA-020 forms, the absence of information regarding possible Indian ancestry does not relieve the court of its affirmative responsibility to inquire at the first appearance of each party whether he or she has reason to know that the

---

[16] As discussed, the Department's detention report also included information from a November 22, 2017 interview with Tamara concerning possible Indian ancestry on the paternal side of her family.

22

children involved are Indian children.  As this court has observed, "[T]he burden of coming forward with information to determine whether an Indian child may be involved and ICWA notice required in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233.)  The court here fulfilled its initial obligation to ask about Tamara's possible Indian ancestry; it failed, however, to ensure the Department complied with its duty of further inquiry based on the responses the court had received from Tamara and Loretta S.

Second, relying on *Austin J., supra,* 47 Cal.App.5th 870, the Department argues the information provided suggested a "mere possibility of Indian ancestry" that was insufficient to trigger the need for further inquiry.  *Austin J.* concerned ICWA compliance in connection with jurisdiction/disposition hearings held in July 2019 at which the juvenile court held ICWA did not apply.  The children's mother and a maternal great aunt had stated their family may have Cherokee ancestry.  After observing "[t]ribal ancestry is not among the criteria for having a reason to know the child is an Indian child" under ICWA or California law after the Assembly Bill 3176 amendments (*Austin J.,* at p. 885), the court of appeal rejected the mother's argument the Department was required to provide ICWA notice to the children.  (*Id.* at p. 887.)  The court additionally held the juvenile court had satisfied its initial duty of inquiry and no duty of further inquiry existed based on the mother's and a maternal great aunt's statements.  (*Id.* at p. 889.)

Explaining that "[i]nformation about a tribal connection that 'is too vague, attenuated and speculative' will not support a 'reason to believe the children might be Indian children,'" the

23

*Austin J.* court held the mother's statement she may have Indian ancestry and had been told her mother had Cherokee ancestry and similar statements by the great aunt did not establish a reason to believe the children were Indian children as defined in ICWA. "At most, they suggest a mere possibility of Indian ancestry. Indian ancestry, heritage, or blood quantum, however, is not the test; being an Indian child requires that the child be either a member of a tribe or a biological child of a member. . . . Indian ancestry, without more, does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member. Here, there is nothing more." (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889.) Even if a claim of Indian ancestry suggested the possibility of Indian tribal membership, the *Austin J.* court continued, "that bare suggestion is insufficient by itself to establish a reason to believe a child is an Indian child." (*Id.* at p. 889.)

We do not agree with *Austin J.*'s narrow reading of the nature and quality of information sufficient to trigger the duty of further inquiry.[17] In particular, that court's insistence a parent's express statement of Indian ancestry does not constitute a reason to believe an Indian child may be involved is fundamentally at odds with well-established ICWA law. To be sure, an "Indian child" is defined in terms of tribal membership, not ancestry. But the question of membership is determined by the tribes, not the

_____

[17] Although *Austin J.*, *supra*, 47 Cal.App.5th 870 was decided in 2020, because it was reviewing ICWA findings from hearings in 2019, the court of appeal did not consider the January 1, 2020 amendment to rule 5.481(a)(4), which applies in this case and requires further inquiry whenever a social worker has reason to believe an Indian child may be involved in the proceeding.

courts or child protective agencies. (See *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65, fn. 21 [98 S.Ct. 1670, 56 L.Ed.2d 106] [Indian tribe is final arbiter of its membership rights]; § 224.2, subd. (h) ["A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe . . . shall be conclusive. Information that the child is not enrolled, or is not eligible for enrollment in, the tribe, is not determinative of the child's membership status unless the tribe also confirms in writing that enrollment is a prerequisite for membership under tribal law or custom"].) That determination often requires providing a tribe with extensive biographical data (that is, information about ancestors and ancestry), which is why section 224.3, subdivision (a)(5)(C), prescribes in detail the information about parents, grandparents and great-grandparents that must be included in an ICWA notice.[18]

Indeed, the imposition of a duty to inquire that is significantly more expansive than the duty to provide ICWA notice is premised on the common sense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status.[19] As a result,

---

[18] Section 224.3, subdivision (a)(5), requires that an ICWA notice contain the names of the child's "biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known."

[19] The Indian Relocation Act of 1956 (Pub.L. No. 84-959, 70 Stat. 986), part of the federal government's Indian termination

25

the information available at the outset of dependency proceedings will often be inadequate to ensure the necessary protection of the rights and cultural heritage of Indian children, Indian families and Indian tribes.  (See Cal. ICWA Compliance Task Force, Rep. to Cal. Atty. Gen.'s Bur. of Children's Justice (2017) pp. 26-30.)  General information from the family about its ancestry frequently provides the only available basis to believe an Indian child may be involved.  (Cf. *In re A.M.*, *supra*, 47 Cal.App.5th at p. 322.)  Additional investigation may not develop further information establishing the need for ICWA notice, but it is essential to the enforcement of the court's and child protective agency's "affirmative and continuing duty to inquire" to construe broadly the duty to make further inquiry.  (See *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 233 [remedial legislation is to be given a liberal construction to promote its objective].)

We also reject *Austin J.*'s related assumption that Assembly Bill 3176, in addition to conforming language in California's ICWA-based statutes to the language in recently adopted federal regulations, was intended to weaken the robust requirements for making further inquiry established by then-existing case law construing former section 224.3, subdivision (c).  Under that former statute, further inquiry was required if a social worker or court-connected investigator "knows or has reason to know that an Indian child is involved."  When Assembly

---

policy, "encouraged" Indians to leave their traditional lands and to assimilate into the general population in urban areas.  (See Oeser, *Avoiding Extinction, Preserving Culture:  Sustainable, Sovereignty-Centered Tribal Citizenship Requirements* (2015) 91 N.D. L.Rev. 1, 29 & fn. 146.)

Bill 3176 modified the definition of "reason to know" to track the language in the federal regulations and removed from that definition "information suggesting the child is a member of a tribe or eligible for membership in a tribe," it simultaneously expanded the language triggering the duty to make further inquiry from "knows or has reason to know" to "reason to believe an Indian child is involved." (§ 224.2, subd. (e).) As the *Austin J.* court observed, the phrase "information suggesting" was not included in the new "reason to believe" standard. (See *Austin J.*, *supra*, 47 Cal.App.5th at p. 889.) Nonetheless, it is difficult to understand how, as a matter of plain meaning, a parent's statement that she has been told she has Indian ancestry through a particular tribe or a specific relative "suggests" her child is eligible for tribal membership (see, e.g., *In re N.G.* (2018) 27 Cal.App.5th 474, 481 [duty to make further inquiry triggered by initial report that children may have Blackfeet, Navajo or Cherokee ancestry]; *In re K.R.* (2018) 20 Cal.App.5th 701, 705-707 [duty triggered by information children "might have Cherokee heritage through their father"]), but does not also provide "a reason to believe" the child may be eligible under the current statute. (See generally *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 511 [statutory construction begins by considering the ordinary meaning of the statutory language].)

The legislative history of Assembly Bill 3176, moreover, belies any inference the amendments were intended to dilute the court's and child protective agency's affirmative duty of inquiry. The report of the Assembly Committee on Judiciary for its April 17, 2018 hearing on the legislation, for example, after noting the bill codified changes required by the new federal regulations into the Welfare and Institutions Code, explained, "In

27

this bill, California has a higher standard for determining if a child *may be* an Indian child and requires that further inquiry must be undertaken for those children." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.) as amended Apr. 11, 2018, p. 10, italics in original.) Similarly, a report from the Senate Rules Committee discussing the final version of new section 224.2, subdivision (e), described the amendments as "revis[ing] the specific steps a social worker, probation officer, or court is required to take in making an inquiry of a child's possible status as an Indian child." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3176 (2017-2018 Reg. Sess.) as amended Aug. 17, 2018, p. 4.) Nothing in that report, or anywhere else in Assembly Bill 3176's legislative history, indicates that, in addition to specifying in greater detail how further inquiry is to be conducted, the legislation was intended to limit the information that would trigger the duty to make further inquiry into a child's "possible status" as an Indian child.

Finally, the recent amendment to section 224.2, subdivision (e), although not directly applicable to these appeals, confirms the Legislature's view the "reason to believe" standard requiring further inquiry concerning a child's possible status as an Indian child should be broadly interpreted. As noted, in urgency legislation effective September 18, 2020, the Legislature amended section 224.2, subdivision (e), to provide in a new subdivision (e)(1), "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting

28

membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (Assem. Bill No. 2944 (2019-2020 Reg. Sess.); Stats. 2020, ch. 104, § 15.)

In sum, further inquiry is required in these cases. As mandated by section 224.2, subdivision (e), on remand the juvenile court must promptly direct the Department to make a meaningful and thorough inquiry regarding Jazmine's, T.G.'s, N.G.'s and P.G.'s possible Indian ancestry, including interviews with extended family members and any other persons who may reasonably be expected to have information regarding the children's tribal membership or eligibility for membership and contact with any tribes that may have such information. If that information establishes a reason to know Indian children are involved, notice in accordance with section 224.3 must be provided to any tribe that has been identified or, if the tribe could not be determined, to the Bureau of Indian Affairs. The Department shall thereafter notify the court of its actions and file certified mail return receipts for any ICWA notices that were sent, together with any responses received. The court must determine, on the record, whether the ICWA inquiry and notice requirements have been satisfied and whether Jazmine, T.G., N.G. and P.G. are Indian children. If the court finds they are Indian children, it is to conduct new section 366.26 hearings, as well as all further proceedings, in compliance with ICWA and related California law. If not, the court's original section 366.26 orders may be reinstated.

4. *The Department's Failure To Comply with the Order To Provide Notice to the Cherokee Nation and the Court's Failure To Make Required ICWA Findings Must Be Addressed on Remand*

In their appeals Tamara and Jason point to two additional errors that occurred in these proceedings. First, although the court at the December 8, 2017 detention hearing ordered the Department to provide ICWA notice to the Cherokee Nation, no notice was ever given. Second, notwithstanding the statement in the minute order from the December 8, 2017 hearing, the reporter's transcript from that hearing reveals the court did not make a finding that there was no reason to know Jazmine, T.G., N.G. and P.G. were Indian children and that ICWA did not apply to their case; and the court failed thereafter to make the required ICWA findings. (See rule 5.482(c) [determination of applicability of ICWA].) The Department disputes both contentions.

As to the order for notice, as discussed, the court, after repeating that Tamara had identified Cherokee ancestry on the maternal grandmother's side, ordered, "The Department is to send notice to the Department of the Interior, the Bureau of Indian Affairs, and the Cherokee Nation." The court then continued, "As to the Cherokee Nation, first, the Department— strike that. As to a specific tribe, on Mother's statement that her paternal grandfather had American Indian heritage, once the mother contacts her aunt, if there is a specific tribe that is identified, the Department is to provide notice to that tribe as well." The Department interprets the court's statement, "strike that," as applying to its order for notice to the Cherokee Nation, eliminating any requirement that the Department send ICWA notice at that point. Tamara and Jason argue the court intended only to restart its order with respect to the paternal grandfather's

potential Indian ancestry, deferring notice concerning that side of Tamara's family until there was information about a specific tribe, but not modifying its order based on the maternal grandmother's statement of Cherokee ancestry. Why else, they ask, would the court have said the phrase "as well"?

Looking only to the court's December 8, 2017 comments, the Department's explanation might be described as unlikely but plausible.[20] But two months later, advised by the Department's counsel there did not appear to be evidence that notice had been given to the Cherokee Nation, the court again ordered notice to the tribe, the Bureau of Indian Affairs and the Department of the Interior. That order was explicit and unambiguous. The Department's failure to comply was error. Nonetheless, at this point the error is harmless. Either further inquiry will establish there is, in fact, reason to know the children are Indian children and notice as required by section 224.3, subdivisions (a) and (b), will be provided to the Cherokee Nation and/or other tribes, or it will not. If notice is given and it is determined the children are Indian children, the juvenile court will be required to revisit its prior orders regarding removal and placement in light of the requirements of ICWA and related state law. If the children are

---

[20] The minute order from the detention hearing states the court did not order ICWA notice to any tribe or the Bureau of Indian Affairs. Throughout our review of the record in these appeals, however, we have encountered minute orders that include findings that were not made or, on occasion, are in direct conflict with the statements as reported in the hearing transcripts. Even under better circumstances the record of the court's oral pronouncements prevails over conflicting minute orders. (See *In re Nia A.* (2016) 246 Cal.App.4th 1241, 1247, fn. 1; *In re A.C.* (2011) 197 Cal.App.4th 796, 799-800.)

not found to be Indian children or notice is not required under section 224.3, the failure to comply with the earlier order will not have adversely affected the outcome of the proceedings or the rights of any Indian tribes.  (See *In re Breanna S.* (2017) 8 Cal.App.5th 636, 653.)

　　We likewise find the juvenile court erred in failing to make findings regarding the applicability of ICWA to these proceedings, but leave it to the court to correct that omission on remand.  We recognize the minute orders for the December 8, 2017 detention hearing recite the court found it had no reason to know that any of the children were Indian children as defined by ICWA.  But that statement is inconsistent with the reporter's transcript and is contradicted by the Department's continued statement for months after the detention hearing that ICWA does or may apply to the case.  As just noted, "'When there is a discrepancy between the minute order and the oral pronouncement of judgment, the oral pronouncement controls.'" (*In re Nia A.* (2016) 246 Cal.App.4th 1241, 1247, fn. 1.)

## DISPOSITION

　　The section 366.26 orders of the juvenile court are conditionally reversed.  The matters are remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.


　　　　　　　　　　　　　　　　　　PERLUSS, P. J.

We concur:

　　　SEGAL, J.　　　　　　　　　FEUER, J.

32